## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION

MARCOSQUARED, LLC;
MARCO MORANTE; and
CHRISTOPHER PSAILA,

Plaintiffs,

vs.                                             Case No. 2025-CV-


JAMES L. WILKES II,

Defendant.                                      **Jury Trial Demanded**

�▬▬▬▬▬▬▬▬▬▬▬▬▬▬/

## COMPLAINT

Plaintiffs, MARCO SQUARED, LLC ("Marco LLC"), MARCO MORANTE ("Morante"), and CHRIS PSAILA ("Psaila") sue the Defendant, JAMES L. WILKES II ("Wilkes") for abuse of process and conspiracy to abuse legal processes; and, as grounds, states:

### JURISDICTION AND VENUE

1.      This is an action within the jurisdiction of this Court as the amount in controversy and Plaintiffs' damages exceed $75,000.00 exclusive of interest, costs, and attorney's fees pursuant to 28 U.S. Code § 1332(a), and this action is between citizens of different States as:

A. Plaintiffs are citizens of the State of California within the meaning of 28 U.S.C. 1332(a).

B. Defendant Wilkes is a citizen of and domiciled in the State of Florida. Wilkes primarily worked and lived in the greater Tampa area including Hillsborough and Pinellas County at all times relevant herein. He remains a Florida resident.

2.    Venue is proper in the United States District Court for the Middle District of Florida (Tampa division) pursuant to 28 U.S. Code § 1391(b)(1) and 28 U.S. Code § 1391(d) as it is the judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

3.    All claims here are pleaded in the alternative and regardless of consistency in accordance with Federal Rule of Civil Procedure §8(d).

**PARTIES**

4.    Plaintiffs Psaila and Morante are the founding partners and majority owners of Plaintiff Marcosquared, LLC, a California limited liability company and successor in interest to Marco Marco LLC. Plaintiffs are residents of the State of California and were residents at all times pertinent to this complaint.

5.    Defendant James L. Wilkes II is a high-profile Florida torts attorney, practicing primarily out of his offices in Tampa, Florida. Wilkes is a close friend and colleague of former California torts attorney, Tom Girardi (referred to herein also as "TG"), and Girardi's wife, Erika Jayne

Girardi (referred to herein also as "EJ"), a "*Real Housewife of Beverly Hills*" cast member.

## Facts Common to All Claims

6.    Tom Girardi's downfall from respected attorney to convicted felon is a tragic and disastrous decade-and-a-half saga of lies built upon lies, i.e., a criminal enterprise masquerading as a law firm. Girardi embezzled more than $100 million from clients in order to finance a conspicuously lavish lifestyle. To accompany him on this journey, Girardi married Erika Chahoy Zizzo in 2000.

7.    In 2000, Erika was a 28-year-old cocktail waitress who yearned for the lifestyle of the rich and famous. Tom Girardi was a 60-year-old torts lawyer who was one in the group of attorneys who backed Erin Brockovich in her investigation of Pacific Gas & Electric for contaminating the drinking water in Hinkley, California. Thanked as an adviser in the film credits of the movie *Erin Brockovich*, this Hollywood blessing boosted Tom Girardi's already substantial reputation as the slayer of companies committing "toxic torts" on unsuspecting and innocent victims.

8.    It was during this time period that Defendant Wilkes became more intimately acquainted with Tom and Erika Girardi. As a prominent tort attorney specializing in elder abuse and nursing home litigation, Wilkes joined the small circle of elite tort attorneys handling class actions

and, often, nationwide litigation. As professional peers do, Wilkes regularly conferred with TG on matters in common. In doing so, Wilkes was allowed to bask in the Girardi glitz and glamor as social and professional opportunities arose.

9.    However, Girardi was not content with the fame and money that came from his successes as an attorney. Tom Girardi wanted more. He embezzled tens of millions of dollars from his clients from some time prior to 2008 and through 2020. In 2008, TG urged Erika to "reignite" her professional career, assuring her that he would pay the bills for whatever it took. Because Erika Jayne's ego needs rivaled TG's, she accepted TG's offer and never looked back.

10.    On June 1, 2022, the California Supreme Court disbarred Girardi. On August 27, 2024, a jury sitting in the United States District Court for the Central District of California found Tom Girardi guilty of several counts of wire fraud in Case No. 23-cr-00047. Girardi is now prisoner number 43156-510, living with nine hundred other inmates in the Terminal Island Federal Correctional Institution at 1299 Seaside Ave., San Pedro, CA 90731. Terminal Island is 31 miles from Girardi's estate in Beverly Hills (actually Pasadena) and light years away from his former "rich & famous" lifestyle. He is 86 years old. The U.S. Bureau of Prisons has scheduled TG for release on August 1, 2031, when he will be 92.

11.    Relevant to this case, in 2016 Tom Girardi directed EJ to contact American Express and accuse Marco Morante, Chris Psaila and Marco Marco of credit card fraud in charging nearly $800,000 across 132 transactions in 2016-2017 to TG's credit card. EJ well-knew that Tom Girardi had an insider relationship with an American Express corporate officer because EJ socialized with this person, who had assured TG that he could refund the $800,000 once he had a complaint in hand. The condition was that, upon refund, Tom Girardi was to keep his many American Express cards paid and up to date.

12.    TG and EJ began their conspiracy to defraud American Express and wrongfully accused Plaintiffs of a credit card fraud while EJ was in Florida for an extended time period in 2016, which included EJ performing for and endorsing the Marco Marco brand.

13.    As of that summer and fall of 2016, Tom Girardi was in a severe cash shortfall, had borrowed millions of dollars to the point of his loan limits, and, as Tom Girardi explained to his American Express insider, Girardi just needed some cash to tide him over until funds started to flow from several tort settlements that would yield millions of dollars to Girardi Keese.

14.    As a backdrop to this event in 2016, beginning no later than 2010 and continuing through at least December 2020, TG, Christopher

Kamon, and others associated with Tom Girardi, including, but not limited to EJ, conspired to embezzle and did embezzle clients' funds held in trust accounts by the Girardi Keese Law Firm. From roughly 2008 through 2020, TG spent more than $25,000,000 of Girardi Keese clients' funds to pay the costs associated with EJ's entertainment career. In most, if not all, of these years EJ's expenses exceeded her income by a factor of three. That is, if EJ made a million dollars in fees for a given year, her expenses as an entertainer would be three million dollars.

15. August 26, 2021, the Trustee filed EJ's 2018 Schedule C as Exhibit E. Doc. 12 in Case No. 21-ap-01155. The Schedule C claims $1,063,572 in income against $2,723,864 in expenses for a loss of $1,660,292. Yet, the Trustee's audit showed that Girardi Keese paid for the expenses EJ claimed as her own. Likewise, the Trustee's audit did not find that EJ paid her $1,063,572 in income to Girardi Keese. Thus, documents in the public record appear to confirm that in 2018, EJ had over a million dollars in income, zero expenses, and paid no income taxes on that income and paid no taxes on the money gifted EJ by Girardi Keese.

16. In Case 2:21-ap-01155 in the U.S. Bankruptcy Court for the Central District of California, the Trustee filed Document 124, which included the *Supplemental Declaration of Nicholas R. Troszak,* the Trustee's expert*,* on 08/16/24. At Pages 20-21, paragraph 22 of that document, Mr.

Troszak stated:

> As of the Petition Date, the Debtor's books and records reflect an asset in the amount of $25,592,261.26 for an account receivable owed from EJ Global, LLC ("EJ Global"). The Debtor's EJ Global receivable account consists of over 13,000 transactions from December 2008 through June 2020. Generally, the activity in the receivable account is a recordation of cash disbursements made by the Debtor to or for the benefit of EJ Global. Exhibit 12 attached hereto contains a summary of the Debtor's cash disbursements, totaled by payee, that were booked to the EJ Global receivable account. During the approximately 11.5 years that this receivable account was active, only one payment in the amount of $150,000 in October 2019 was made by EJ Global to the Debtor. The receivable account balance at the time of the EJ Global deposit was approximately $25,562,890.

17. Upon information and belief, Wilkes and Evan Borges, an attorney Wilkes hired to represent EJ in the Girardi Keese and Tom Girardi bankruptcies in California, understood these facts in devising their abusive plan to use the legal processes as a means to intimidate the Trustee and anyone else (like Plaintiffs) who dared to question EJ's sham posing as the innocent spouse. They decided EJ could not cooperate with the Trustee's efforts to recover funds and executed their plan to obfuscate the bankruptcy proceedings regarding EJ's involvement for the purpose of hiding EJ's malfeasance from the Trustee, creditors, and state and federal law enforcement officers.

18. TG's façade began to rapidly crumble from 2016 to 2020 because Girardi Keese's income could not keep up with the firm's need to

pay disgruntled clients somthing, referring and associated law firms, and to pay for the TG/EJ lavish lifestyle.

19.    In 2016, TG needed cash – fast. Thus, TG instructed EJ to report to American Express and law enforcement authorities that Marco Marco, LLC, Marco Morante, and Chris Psaila had committed credit card fraud by charging services and non-existent costumes designed and manufactured by their company to the American Express Card given to EJ by TG.   EJ had given one of Tom Girardi's personal Amex Credit Card numbers to Marco Marco's Chris Psaila, who was the business manager. It was to that Amex card number that Marco Marco charged nearly $800,000 in service, artistic, and garment fees in 2016-2017.

20.    Because TG had insider connections to both the U.S. Secret Service and American Express, the time from complaint to indictment was short. Chris Psaila was indicted in the Central District of California for seven counts of credit card fraud on April 28, 2017. After providing the Central District's U.S. Attorney's with the pertinent books, records, and photographs of EJ wearing the very costumes she said she never got, the U.S. Attorney moved to dismiss those charges on September 28, 2021.

21.    On August 29, 2023, Psaila sued EJ and other Defendants alleging a conspiracy to maliciously prosecute Psaila for the sole reason of providing American Express a defendable reason to refund almost

$800,000 to TG for every cent that Marco Marco invoiced EJ in 2016-2017. After American Express refunded that $800,000 to TG, it made no demand on Marco Marco, Chris Psaila or Marco Morante for reimbursement even after the US Attorney indicted Psaila.

22.    On information and belief, TG's American Express insider-officer did not demand payment from Psaila or Marco Marco because he did not want to invite Amex internal scrutiny of the event. He was using the Psaila indictment as a means to justify the refund to TG to American Express auditors who would not (and did not) question the authority of the US Attorney.

23.    On August 9, 2024, Marco Morante sued EJ and two of her assistants for conspiracy to defame, defame by implication, and to tortiously interfere with Morante and his business with customers and clients throughout the entertainment world. That lawsuit – *Morante v. Erika Girardi, et al.*, Case No. 2024-CA-015118 in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida – has been delayed by Defendant EJ's abusive delay tactics by first, moving to dismiss for lack of Florida jurisdiction, and, second, by refusing to respond to discovery that would confirm that EJ conspired while in the State of Florida to use Plaintiffs as scapegoats in order to help TG perpetuate his nationwide embezzlement scheme.

24. From at least 2000, Defendant James Wilkes II ("Wilkes") was a personal friend of TG's and frequently traveled with TG and EJ on their yacht, attended expensive sporting events with TG and EJ, dined in expensive restaurants with TG and EJ, stayed in TG and EJ's California mansion, and otherwise attached himself to the flashy and opulent lifestyle TG and EJ so enjoyed.

25. No later than 2019, TG let Wilkes know of his growing predicament of being "underfunded" and that TG had "borrowed" funds from his trust fund accounts to pay the bills for EJ and himself. Suspecting there was more to the story, Wilkes urged TG and EJ to separate and to devise a story that would protect EJ from financial ruin or even criminal prosecution in the event that TG could not extract himself from the many lawsuits filed against TG. Thus, taking Wilkes' advice, EJ filed for divorce on November 3, 2020, just six weeks before creditors filed their involuntary petition that put Tom Girardi and Girardi Keese into Chapter 7 Bankruptcy proceedings.

26. During the initial stages of the bankruptcies, Wilkes directed EJ to follow a traditional path and hired a competent, ethical attorney to represent her. However, as the facts and overwhelming depth of Tom Girardi's criminality became known, Wilkes recognized that if EJ did not act in a way that would intimidate the Trustee – and other persons/entities

harmed by her reckless lifestyle choices and tacit agreements with TG – that she could be held civilly and criminally accountable for her willing collaborations with Tom Girardi. So, Wilkes went on the offensive.

27.    Having decided that EJ could not be her own spokesperson or that her "Erika Jayne" character would not play well to a judge or a jury, Wilkes decided on a course where EJ's bankruptcy attorney would obstruct, delay, and impede the Trustee and the Bankruptcy Court in their work to recover funds for claimants as much as he could and to the verge of sanctions. Thus, Wilkes replaced EJ's bankruptcy counsel in June 2021 and retained Attorney Evan Borges, who entered his appearance on behalf of EJ on July 5, 2021.

28.    Thereafter, Borges, under Wilkes's direction, embarked on a "slash and burn/obstruct/delay" defense against the Trustee's efforts to obtain a $750,000 set of earrings purchased for EJ by TG with embezzled funds and the $25,000,000 plus that Girardi Keese had used to pay for EJ's entertainment career expenses.  Again, the TG and Girardi Keese bankruptcy dockets do not plainly reveal the whereabouts of more than $10,000,000 that EJ clearly earned from 2008-2020.

29.    The Trustee confronted the Wilkes/Borges obstructionism in her reply filed on August 8, 2023:

Erika's relentless and baseless opposition continues to require the Trustee to devote significant resources to defending the

Estate. With each opposition, the Estate's administrative
expenses needlessly climb. And when administrative expenses
grow, the Debtor's victims needlessly pay the price. For
decades, Erika funded her extravagant lifestyle off money
stolen from the Debtor's clients. By continuing to interfere with
the Trustee's administration of the Debtor's case, Erika is re-
victimizing the same people she claims to be helping. Simply
put, Erika's self-appointed role as caretaker of the victims—
the same victims she has publicly and repeatedly questioned—
is nothing more than a farce.

Page 5 of Doc. 1869 in Case No. 20-bk-21022 in the U.S. Bankruptcy

Court for the Central District of California and refiled as an exhibit as part

of Document 124 cited in Paragraph 16 of this Complaint in August 2024.

    30.    At the final hearing and after nearly two years of EJ delays, the

Court admonished Borges for making frivolous arguments based on made

up facts and no law.  The following quotes are from Doc. 1902 in 20-bk-

21022:

THE COURT: "Well, for instance, you [Borges] make a lot of
statements in your opposition, but, you know, argument is
not evidence." Page 5:17-18

"You're [Borges] stating facts, are you not, in your brief? [Page
6:25]

"And that's improper because why? There's no declaration to
support it. Can you state it just in a brief? Does that make it
admissible? [Page 7:6-8]

MR. BORGES: "It does not make it admissible . . ." [Page 7:9]

THE COURT: "You're making -- you're making -- without any
evidence, whatsoever, you are saying you're opposing this, and
these are the facts why. You understand that that's, as far as

evidence is concerned that is considering the motion, I can, you know, tell the jury to ignore it. I can certainly do that. That's what I'm trained to do." [Page 9- 10:19-1]

THE COURT: "You have no evidence of any of this, isn't that correct?" [Page 10:3-4]

THE COURT: "-- and you have your opposition, but your opposition basically states no opposition because you're talking about facts which you are not attesting to. You recognize that." [Page 11-12:23-1]

MR. BORGES: "—this is not evidence. [Pages 12-13:24-3]

THE COURT: "I'm not sure we're on the same wavelength. Do you not understand what I am saying? You are stating facts in here that you need more time, and so forth. Where is your evidence of that? Just saying it doesn't make it true, does it? Isn't that what declarations under penalty of perjury are about?" And I'm surprised that you're surprised at that proposition, that in order to state facts in here you need to say it under penalty of perjury. Does that surprise you, that concept? [Page 13: 9-17]

31.    In short, Wilkes directed Borges to obstruct and misdirect the bankruptcy proceedings in order to obfuscate, confuse, and misdirect the Trustee and the trial judges in several bankruptcy proceedings in the U.S. Bankruptcy Court for the Central District of California, including, but not limited to:

a. *In Re Girardi Keese*, Case No. 20-bk-21022.

b. *Trustee Miller v. Erika Girardi*, Case No. 21-ap-01155.

c. *In Re Tom Girardi*, Case No. 20-bk-21020.

32.    Likewise, Wilkes directed Borges to file dilatory motions,

perjurious affidavits and declarations, and to advance ridiculous and time-consuming oppositions in Plaintiffs' and others tortious conduct lawsuits, including, but not limited to:

    a. *Psaila v. Erika Girardi,* et al., Case No. 23-cv-07120, in the United States District Court for the Central District of California.

    b. *Marco Morante v. Erika Girardi, et al.,* Case No. 2024-CA-015118, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

33. Further, in making these allegations, Plaintiffs' counsel reviewed the dockets of the cases set out above, other cases not cited (yet), and cites the following table to provide Defendant Wilkes and this Court with a timeframe of EJ's, and then, Wilkes', wrongful conduct, beginning with Plaintiff Psaila's wrongful indictment through Wilkes' entry as EJ's best friend, financier, and attorney of record in Plaintiff Morante's Florida lawsuit against EJ and her former assistants, Michael Minden and Laia Ribatallada, in 2024. These cases prove the abuses of process that Wilkes and his retained attorneys have visited upon the California courts, the Florida courts, and the Plaintiffs:

| Doc. & Case No. | Date | Comments |
|---|---|---|

| | | |
|---|---|---|
| **Doc. 1 in Case 17-cr-00257: USA v. Psaila.** | 04/28/17 | Indictment charging Psaila with seven counts of credit card-wire fraud. |
| **20STFL11050**<br><br>Erika sues TG for dissolution in Superior of Los Angeles | 11/03/20 | Contrary to statements to the contrary made by EJ's attorneys as recently as 2024, Erika remains married to TG as of the filing of this complaint.<br><br>In several documents, including an affidavit EJ filed in **Case 23-cv-07120,** Psaila's California complaint vs. Erika et al., EJ says her marriage to TG ended in 2020. This is not true. EJ remains married to TG. |
| **Doc. 1 in 20-bk-21022 –** Ch. 7 Involuntary Petition vs. Girardi Keese | 12/18/20 | This is the primary bankruptcy proceeding that catalyzed the investigations into Tom Girardi's corrupt practices. Creditors filing the petition were primarily attorneys with professional relationships with Girardi Keese who had not been paid. |
| **Doc. 139 in 20-bk-21020 (TG bankruptcy)**<br><br>**EJG's claim for marital exemptions** | 03/23/21 | Filed by Attorney Peter J. Mastan for Erika Girardi.  Mastan also attaches EG's petition and TG's response, which requests the divorce as well.<br><br>This motion appears to have been abandoned by Attorney Borges. |
| **Doc. 208 in 20-bk-21020 –** Dinsmore & Shohl, LLP (Mastan) Motion to Withdraw representation of Erika Girardi | 06/15/21 | Breakdown in relations with client stated by Mastan. EG did not have replacement attorney as of filing. Doc. 209 – Order allowing Mastan to withdraw is granted the same day.<br><br>Same motion is filed in 21022 |
| **Doc. 218 in 21020 Mastan's Motion to withdraw** | 06/17/21 | Mastan now represents EJ again. |
| **Doc. 235. In 21020.** EJ's Motion | 07/05/21 | EJ, Mastan, and Evan Borges sign motion removing Mastan and inserting Borges.<br><br>Same motion filed in #21022 on same day. |

| to Substitute Borges for Mastan | | |
|---|---|---|
| **Doc. 12 in 21-ap-01155** – Adversary Complaint v. Erika Girardi to recover diamond earrings and $25 million | 08/26/21 | Besides stating detailed allegations claiming that Erika Jayne Girardi ("EJ") was part and parcel of Tom Girardi's ("TG") 2008-2020 embezzlement scheme, the Trustee attached Exhibit E, EJ's Sch. C (Form 1040) for 2018. In this Schedule, EJ stated $1,063,572 in income against $2,723,864 in expenses for a loss of $1,660,292. |
| **Doc. 71 in 17-cr-00257-** Government Motion to Dismiss Psaila Indictment | 09/28/21 | With little explanation, Government dismisses indictment after Psaila provided proof of every purchase which the Government alleged to be fraudulent. (See, Doc. 1-1 in Case No. 23-cv-07120, *infra*.) |
| **Doc. 53 in 21-AP-01155 BR-** Trustee vs. Erika Jayne - Transcript | 06/30/2022 | BR Judge denies any defense based on Statute of Repose because it did not begin to run until BR Trustee took possession of GK records. Plus, Judge held that purchase of the earrings in 2007 was fraud by TG – an embezzlement, a theft. P. 41 |
| **Doc. 79 in 21-AP-01155 BR.** District Court Order reversing BR Order against Erika Girardi's ownership claim of $750K earrings | 05/01/2023 | DC ruled that BR Trustee had not proved separate identity of money (from sale of earrings worth $750K) was lost and that funds used to buy earrings were commingled with Girardi Keese trust funds. |
| **Doc. 1787 in 20-bk-21022 BR.** Trustee Motion to Close and Consolidate Accounts | 06/01/23 Doc. 1787 | Key issue for EJ was Trustee's expert testimony that GK comingled trust accounts and the Declaration of the Trustee's Expert Witness Nicholas Troszak. |
| **Doc. 1805 in 20-bk-21022 BR.** EJ Opposition to | 06/15/23 | Without citation of undisputed facts or law, Borges argues that the Trustee is abusing the clients of GK who lost money. |

| | | |
|---|---|---|
| Trustee's Motion to Close Accounts | | |
| **Doc. 1869 in 20-bk-21022:** Trustee's Reply to Doc. 1805. | 08/08/23 | Here, the Trustee vehemently takes EJ to task for causing delays for no reason other than her attempts to "continue her targeted self-serving campaign of harassment against the Trustee in an effort to rehabilitate her tarnished public image." |
| **Doc. 1902 in 20-bk-21022.** Hearing Transcript on Trustee Motion to Close Accounts | 08/15/2023 (filed on 08/25/25) | Judge overrules EJ's objections and grants Trustee's motions after berating Borges for arguing falsities ("your concerns are not evidence"), for delaying matters in which EJ has no interest, and for not having legal basis to object all the while Borges pretends he wants to expose the "wrongdoers and enablers of Tom Girardi." |
| **Doc. 1883 in 20-bk-21022:** Order Granting Trustee Motion to Close Accounts | 8/15/23 | Besides granting the Trustee's motion, the court overruled EJ's Opposition "in its entirety." |
| **Doc. 1 in Case 23-cv-07120.** Psaila complaint vs. EJ et al. | 08/29/23 | Alleges a conspiracy to maliciously prosecute Psaila by falsely claiming that Psaila committed credit card fraud on EJ for the purpose of aiding and abetting TG in his scheme to obtain much needed cash which he, in turn, used to conceal his Ponzi-scheme law practice. |
| **Doc. 105 in 21-ap-01155.** Trustee's Reply to EJ's Opposition to T's Opening Brief | 11/09/23 | Notable because the Trustee cites the Transcript, Doc. 1902, above, in arguing that EJ's unfounded opposition and lack of cooperation resulted in significant losses to the Estate and that even after being admonished by the Court on 8/15/23, EJ continued to file frivolous motions while EJ caused over two years of delays. In support, the Trustee cited the Court chastising EJ and her counsel for using their filings to pull a "PR stunt." |

| | | |
|---|---|---|
| **Doc. 2083 in 20-bk-21022. California Bar Stipulation beginning CA Bar's Investigation of TG's relationship with Bar Staff (TG disbarred on 6/01/22).** | 02/22/24 | This document memorializes the Trustee's cooperation with the Bar to provide the fruits of the Trustee's investigation into the 15 plus years of Tom Girardi's well-hidden Ponzi scheme of a law firm. The Bar was investigating a senior staffer who was alleged to have taken money from TG to hide, dismiss, and otherwise dispose of complaints made against TG and GK. |
| **Doc. 138 in 21-ap-01155.** Order Approving Trustee Motion for Turnover of Earring/Proceeds | 10/23/24 | After an evidentiary hearing was held on 9/24/24 (after remand from appeal), Order for Trustee entered. EJ's "Evidentiary Objections" were denied.<br><br>In entering the Order, the judge listed all of EJ's motions, Trustee oppositions, and EJ Responses encompassing over 20 docket entries, and then, denied EJ's "Evidentiary Objections." |
| **Doc. 139 in 21-ap-01155.** FoF/CoL entered in support of Order Approving Trustee Motion. | 10/25/24 | Found that EJ presented no evidence on the issue of tracing trust funds, failed to present any expert evidence, and merely objected without basis. Ergo, the judge denied EJ's "evidentiary objections" and each and every one are denied in their entirety. Likewise, the Court rejected EJ's reliance on the Statute of Limitations and Statute of Repose. |
| **Doc. 1 in 25-cv-01038.** Referral of 2021-AP-01155 BR to District Court for trial. | 02/06/2025 | 21-AP-01155 BR becomes 2:25-cv-01038 for trial in District Court |
| **25-cv-01038: Status Conference Minutes.** No document filed. | 07/30/25 | MINUTES OF STATUS CONFERENCE HELD before Judge Anne Hwang. The case is called and counsel state their appearances. The Court and counsel confer. Following oral argument, the Court advises counsel that the Court will set the Pretrial Conference for January 21, 2026 at 1:30 p.m. and the **Jury Trial date is set** |

|  |  | **for February 10, 2026** at 8:30 a.m. Counsel are reminded t**hat there will be no more motion practice.** A written order will be issued with further deadlines. Court Reporter: COURT SMART. Attorney for Plaintiff: Larry W. Gabriel. Attorney for Defendant: Evan C. Borges. Courtroom Deputy: Yolanda Skipper. Time in court: 09 mins. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ys) (Entered: 07/31/2025) |
|---|---|---|

34.    In the course of Girardi's criminal scheme, he diverted tens of millions of dollars from his law firm's operating account to pay illegitimate expenses, including more than $25 million to pay the expenses of EJ Global, a company formed by his wife, Erika Jayne Girardi, to promote Erika Jayne's entertainment career, which included being one of the Real Housewives of Beverly Hills ("RHOBH"). Girardi funded Erika Jayne's "career" as a brazen-blond novelty act catering to an "LGBTQIA+ audience" and parlayed her marriage to the rich and famous Girardi to audition for a featured role in The Real Housewives of Beverly Hills ("RHOBH"). RHOBH chose Erika Jayne to be one of the Real Housewives, a role she began in 2015 and continues to the present.

35.    Through the years Wilkes befriended EJ and in 2019 was her principal advisor, working with Tom Girardi to project how the embezzlement scheme would play out in the civil and criminal courts.

Wilkes' advice, once Tom Girardi was separated from EJ, turned into aiding and abetting Erika Jayne and her two top aides, Michael Minden and Laia Ribatallada, in hiding and obscuring their own tortious (and criminal) conspiracy to defraud American Express by accusing Plaintiffs Marco Marco LLC, Morante and Psaila of credit card fraud in 2016.

36.    Indeed, as far back as August 26, 2021, the Trustee recognized that EJ had a talent for attracting financial support from older gentlemen:

> 23. Erika has direct knowledge that for at least 12 years, all of her expenses were being paid by the Debtor as she was generating them.  Moreover, Erika has repeatedly contended, "It is expensive to be me".  In fact, there was an entire publicly aired episode on "The Real Housewives of Beverly Hills" entitled, "It's Expensive to Be Me". (Season 7, Episode 7). The glam cannot be supported by a sham. This decade long spending spree was improperly paid for by Erika's community property law firm. Erika has repeatedly contended that she is entitled to any left-over money from this Estate.  She has signed years of joint tax returns.  Even though knowledge is not required for liability, it is alleged she knew exactly where the money was coming from when her $175,000 per month spending budget was paid each month by the law firm on the law firm's credit card issued to her personally as well as the submissions for payment were made by her and her alone. Erika directed all of her personal vendors to be paid by the law firm. Only Erika knew that her entire singing, acting, bling, brand, glam squad, and other Erika-only expenses were completely funded by the Debtor. **Even to this day, it is alleged that Erika continues to receive funding from other sources of unknown origin to cover her extravagant lifestyle.** [emphasis added]

Page 8 of Doc. 12 in Case No. 21-ap-01155, Trustee's Amended Complaint.

37.    In a telling interview in December 2023, Wilkes and Borges

attempted to assuage EJ's negative ratings garnered after the airing of the ABC News documentary, *The Housewife and the Hustler*, which aired in 2021. In that interview/conversation, Wilkes admits to being at least one of "other sources of unknown origin." The December 2023 conversation aired as part of *The Housewife and the Hustler 2: the Reckoning* in February 2024:

> **Evan Borges:** In summer 2021 you and Erica were referred to our firm.
>
> **Jim Wilkes:** So far, we've had to play defense.
>
> **Evan Borges speaking to Wilkes:** I had some very basic questions for her, why did you file for divorce just a month or so before the bankruptcy cases? And what did you know? And her answer to me is privilege, but I would describe it as escalating pressure, lawsuits. My strong suspicion – I wasn't there – is that Tom Girardi consistently lied to this poor woman, and she had no idea. She had no visibility into finances. I heard from you, he forbade her from wearing blue jeans. That's called either a control freak or an asshole; however you want to put it. She left that marriage. The only reason Erica was really able to do that was because of help from a longtime friend she had - meaning you, I think you gave her $150,000 to pay for a lawyer and to move out.
>
> **Evan Borges [Speaking to the camera]:** Jim opened up a bank account with her and provided her with, over time, a significant amount of money to pay for lawyers to make a down payment on a rental. I mean, if she didn't have the help of a friend who had a lot of money, she was lost. I mean, it was, it was bad.
>
> **Female voice questioning Wilkes:** How much have you spent on this?
>
> **Jim Wilkes speaking to camera while video shows photos of Erika on yacht and Arnold Schwarzenegger/Charles Barkley with Tom Girardi:** I have no idea. Over a couple

million. What It's cost me in my practice, I can't conceive. I knew Tom since about 2000. Erica and Tom and I would get to spend time together hanging out. We probably did four or five or six trips with them. Tom knew a lot of fun people. I was in boxing, and I got a picture somewhere of Schwarzenegger sitting on the right, Charles Barkley on the left. He loved that kind of stuff. But around 2009 or 10, Tom changed. Tom became very angry. You could tell there was a little hustle in him, but he was always cordial, and he stopped being cordial, and it scared me. Erica has been the victim of a great injustice. Her crime was having a husband who wasn't trustworthy, that she stayed with for 20 years.

38.    By providing financial aid to EJ, Wilkes is in *de facto* and *de jure* violation of Florida Bar Rule 4–1.8(e) prohibiting a lawyer from providing financial assistance to a client in connection with pending or contemplated litigation. Furthermore, because Borges and Wilkes admit that Wilkes came to EJ's rescue as a friend, no attorney-client relationship arose between Wilkes and EJ [*People v. Gionis, supra,* 9 Cal.4th at p. 1212, 40 Cal.Rptr.2d 456, 892 P.2d 1199].

39.    When Borges' characterized what EJ told him in a supposed privileged conversation very likely waived EJ's claim to attorney-client relationship with Borges, as well. *Coates v. Akerman, Senterfitt & Eidson, P.A.*, 940 So. 2d 504, 511 (Fla. 2d DCA 2006) and *Alpha Beta Co. v. Superior Court*, 203 Cal. Rptr. 752, 758 (Ct. App. 1984) holding that the attorney-client privilege is waived when the holder of the privilege, without coercion, discloses a significant part of the confidential communication.

40.    However, neither Wilkes nor Borges was concerned about the

attorney-client relationship because they knew that their only hope for EJ was to keep her from testifying under oath as they ran out the litigation clock by sapping resources of trustees, plaintiffs and trial courts.

41.    On information and belief, the source of the funds that Wilkes used to pay, invest in, or loan Erika Jayne and her team, and to pay attorneys to defend Erika Jayne and team in other lawsuits, were two Covid loans from the Paycheck Protection Program ("PPP Loans") in the amounts of $2,393,079 (approved 04/07/2020 for payroll expenses) and $2,000,000 (approved 01/25/2021 for payroll expenses) and made to The Wilkes Firm, P.A. Tampa. The U.S. Small Business Administration forgave both of these loans, which were meant for salaries for employees who would otherwise be laid off due to the Covid Pandemic.

42.    Upon information and belief, Wilkes perpetrated his fraud on the PPP program by substantially overstating the number of Wilkes Firm, PA employees and by falsely claiming that his employees lost salaries during the pandemic.  In fact, the Wilkes law firm continued to operate, continued to settle and even try cases, and while the pandemic caused a lag in cash flows, the pandemic did not substantially affect the firm's tort business.

43.    Upon information and belief, the $2 million Wilkes wrongfully invested in Erika Jayne represents an amount stolen from the United

States treasury by fraudulently overstating the number of employees in his law firm. In Wilkes' first application, he represented to the PPP that his firm had 40 full-time positions more than it actually had. In his second application, Wilkes represented that his firm had 41 full-time positions more than it actually had.

44.    Further, of the 100 or fewer employees Wilkes did have, few were laid off and all were paid because the Firm's tort business did not halt during the Covid Pandemic.

45.    Thus, after hiring Evan Borges, EJ and Wilkes implemented Wilkes' scheme, which was to use his considerable legal skills to subvert the legal processes in the many lawsuits that threatened EJ civilly and which could lead to criminal investigation as well. Wilkes plan was simple:

A. Wilkes would hire and supervise attorneys in the civil lawsuits against Erika Jayne.

B. Wilkes, then, would direct the attorneys to keep Erika Jayne from being cross-examined, in deposition or hearing, by any means whatsoever and in violation of Attorney Rules of Conduct and the California, Florida, and Federal Rules of Civil Procedure. That is, Wilkes intentionally decided to violate his attorney's oath to abide by applicable codes of conduct and rules of civil procedure to ensure that Erika Jayne, and her associates, would not be put

into positions of having to be cross-examined under oath in deposition and trial.

C. Moreover, the purpose of the conspiracy to violate rules of conduct and procedure was to intimidate and coerce Psaila, Morante, and their companies from pursuing their claims against Erika Jayne, Ribatallada, Minden, and now, Wilkes.

46.    Wilkes' ulterior motives in investing in, supporting, and representing Erika Jayne included personal gratification in gaining fame and becoming part of a star-studded lifestyle not available to him in Tampa, Florida, the enhancement of his own reputation and the personal gain to be derived from his own plaintiffs-torts practice, and, of course, the personal relationship with Erika Jayne.

47.    In pursuing his relationship with Erika Jayne, Wilkes scorned the fact that, in 2021, the federal government dismissed the Psaila indictment because EJ's sworn testimony against Psaila, Marco LLC, and Morante was false and possibly perjurious. Instead, in a subversion of our criminal/civil justice system, Wilkes successfully frustrated the legal processes in cases wherein Plaintiffs (and others) are attempting to clear their names and/or gain redress for the civil wrongs perpetrated against them. His acts have stonewalled and obfuscated the civil discovery processes set out in codes of conduct, rules of civil procedure, and

common law. In short, Wilkes crossed the line from vigorous advocacy into abuse of process.

48.    Wilkes' abuse and misuse of the legal processes include, but are not limited to the following acts:

A. **Psaila v. Erika Girardi et al, Case No. 2:23-cv-07120, in the United States District Court for the Central District of California**: In this case, Wilkes paid for and supervised Erika Jayne's defense attorneys, helped in drafting the perjurious affidavits given by Erika Jayne, Minden, and Ribatallada in support of their efforts to dismiss/strike the Psaila complaint with their hope to extort attorneys' fees from Psaila via an anti-Slapp motion/appeal or intimidate Psaila into dismissing his legitimate claims by perverting the normal processes associated with litigation.   In abusing the legal processes of litigation, Wilkes is attempting to pressure Psaila to abandon his cause of action by running up legal fees and costs, and is attempting to pressure Psaila to admit to Psaila's customer base that the United States Attorney in the Central District of California dropped the wire fraud charges against Psaila for reasons other than his innocence. By spreading the untruth that "Psaila got off on a technicality," Wilkes is aiding and abetting Defendants in their tortious conduct as well as abusing the litigation processes by threatening and intimidating Psaila and Morante.

B. **Sheldon Law Offices v**. **Girardi, EJ Global et al., Case No. 20STCV47160, in the Superior Court of the State of California for the County of Los Angeles, Central District:** in this case, Wilkes paid for and supervised Erika Jayne's defense attorneys and advised Erika Jayne prior to her deposition on August 4, 2022, that she would have to confirm that: a) she still believed she was telling the truth when she made criminal accusations against Marco Squared, LLC, Psaila, and Morante; b) the Wilkes law firm was billing her for legal services (even as Erika Jayne was forced to admit in that deposition that "Yes. Jim Wilkes, my attorney, my personal attorney, has loaned me the money to pay my legal fees."); and c) she was ignorant of Tom Girardi's malfeasance.

C. **Morante v**. **Girardi, et al., Case No. 2024-CA-0151118, in the Circuit Court for Miami-Dade County, Florida:** in this case, Wilkes, as co-counsel, pays and supervises other defense attorneys selected by Wilkes. He advised Erika Jayne, Minden, and Ribatallada to file deceiving affidavits and to stonewall on answering discovery by directing his selected attorneys to file baseless objections to discovery interrogatories and requests for admissions, all in an attempt to intimidate Plaintiff Morante and his attorneys from pursuing their claims. Yet, Erika Jayne admits that Wilkes opened an account for her

with Wilkes' funds and that the purpose of those funds was for Erika Jayne's personal use.

49.    Thus, Wilkes acted outside the scope of his representation because a Florida attorney: a) does not provide a professional service when the attorney is participating in a conspiracy to aid or abet a client's fraudulent scheme; and b) engagement in fraudulent conduct is outside the scope of legitimate professional representation. Further, as cited, Florida Bar Rule 4–1.8(e) prohibits a lawyer from providing financial assistance to a client in connection with pending or contemplated litigation. That is, Wilkes is legally representing a person, EJ, whom he is currently supporting, or has financially supported.

50.    As of the filing of this complaint, Wilkes has put himself and his alleged clients, Erika Jayne, Minden, and Ribatallada, into a dilemma where they believe they have no choice but to continue the cover-up given the dire, potentially career-ending prospects of having to admit that they lied in order to defraud American Express and keep themselves in business.

51.    In directing and planning the cover-up from at least 2020 to the present, Wilkes chose to abuse the legal process in the several matters of litigation listed herein in order to convince the RHOBH production team, other entertainment employers and venues, and Erika's fanbase that Erika

Jayne told the truth to the Secret Service about the alleged fraud perpetrated upon her by Plaintiffs.

52.    Wilkes, as the mastermind of the scheme to promote Erika Jayne's career at the expense of Plaintiffs' lives and careers, proximately caused the damages suffered by Plaintiffs from the loss of their business and livelihoods in the years 2020 to the present.

53.    Likewise, Wilkes, after taking over command of Erika Jayne's extraction from Tom Girardi's downfall, advised Erika Jayne, Minden, and Ribatallada what they should and could say to the media, never inquired as to, or ignored the truth about, the false claims made against Plaintiffs.

54.    As recently as February 9, 2023, Erika Jayne, at Wilkes' direction, told the *Los Angeles Times*: "In no way did I pull a scam to get $760,000 to help anybody get this money [referring to the money Erika accused Psaila and Morante of feloniously charging to Erika's Amex credit card]."

55.    As regards to Wilkes motivations for joining the conspiracy, Wilkes was driven by his need to be involved in controversy and to be in control of that controversy. That is, being the key advisor to Erika Jayne, brought Wilkes to a new and exciting lifestyle that was ego-aggrandizing and highly entertaining.

**Count I: ABUSE OF PROCESS**

56.    Plaintiffs incorporate paragraphs 1- 55 herein as if the same are fully pled hereunder.

57.    Wilkes representation of Erika Jayne, Minden, and Ribatallada and his directions to counsel to stonewall, obfuscate, delay, and obscure the truth that Plaintiffs did not commit credit card fraud, constitute an illegal, improper, and/or perverted use of the legal process.

58.    Wilkes' ulterior motive or purpose in exercising the illegal, improper, and/or perverted process, is to ensure that his investment in Erika Jayne is not lost. If EJ and her team were indicted for perjury or tax fraud or if EJ would confess to her own complicity with Tom Girardi and his schemes, Wilkes' own reputation and career would be severely harmed. Thus, Wilkes has no qualms about continuing to sacrifice Plaintiffs' reputations and livelihoods in order to protect his own.

59.    As a gifted and successful plaintiff's torts attorney, Wilkes is abusing the legal system that has given him so much.

60.    Because of Wilkes actions and inactions in manipulating the legal processes, as set out above, Plaintiffs have suffered and continue to suffer economic damages in the form of lost business, lost profits, and, of course, legal and other fees in connection with Erika Jayne's, Minden's, and Ribatallada's continued attacks on Plaintiffs' business practices, veracity, and characters.

## Count II: CONSPIRACY TO ABUSE PROCESS

61.    Plaintiffs incorporate paragraphs 1- 55 and 57-60[1] herein as if fully pled.

62.    In working with Erika Jayne, Minden, Ribatallada, Evan Borges and others, Wilkes formed a conspiracy with these persons, and with others not named herein, to abuse the legal processes of the several lawsuits cited and others, including but not limited to, the bankruptcy cases that ensued from the collapse of Girardi's empire.

63.    Defendant Wilkes' misuse of the legal processes on behalf of Erika Jayne sought to harm and did harm Plaintiffs.

### DEMAND FOR JURY TRIAL

**Plaintiff demands a jury trial on all issues triable by right.**

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

(a)    Award damages in the amount of or being greater than $300,000.00 for each Count set out herein;

(b)    Award exemplary and punitive damages;

(c)    Order Defendants to pay Plaintiff's reasonable attorney's fees and costs incurred in connection with this action;

(d)    Award prejudgment interest; and

(e)    Enter any other orders or further relief as the Court may deem

---

[1] These allegations are incorporated into this Count due to Counts one & two being related.

proper.

Respectfully submitted,

**WILLIAMS & SYFRETT, PLLC.**

/s/ Stephen Syfrett
STEPHEN SYFRETT, ESQ.
FL BAR NO.:  124536
502 Harmon Avenue (32401)
Panama City, Florida
(850) 763-5368 (telephone)
Stephen@wsgfirm.com
*Counsel for Plaintiffs*


Joined by:

BRUCE BERNARD BEALKE
Illinois SBN 6200543
77 West Wacker Drive, St. 45001
Chicago, IL, 60601
(312) 216-7177
Bealkelaw@protonmail.com
*(Co-Counsel pending admission as
Pro Hac Vice)*