### IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION

MARCOSQUARED, LLC;
MARCO MORANTE; and
CHRISTOPHER PSAILA,

Plaintiffs,

vs.                                                   Case No. 8:25-cv-3146-CEH-LSG

JAMES L. WILKES II,

Defendant.                                      **Jury Trial Demanded**
_____/

### FIRST AMENDED COMPLAINT

Plaintiffs, MARCO SQUARED, LLC ("Marco LLC"), MARCO MORANTE ("Morante"), and CHRIS PSAILA ("Psaila") sue the Defendant, JAMES L. WILKES II ("Wilkes") for abuse of process and conspiracy to abuse legal processes; and, as grounds, states:

### JURISDICTION AND VENUE

1. This is an action within the jurisdiction of this Court as the amount in controversy and Plaintiffs' damages exceed $75,000.00 exclusive of interest, costs, and attorney's fees pursuant to 28 U.S. Code § 1332(a), and this action is between citizens of different States because:

   A. Plaintiff Marcosquared, LLC is a California limited liability company with it principal office in California and is a citizen of

the State of California within the meaning of 28 U.S.C. 1332(a).

B. Plaintiffs Marco Morante and Christopher Psaila are the sole owners and only members of Marcosquared; and are residents and citizens of the State of California within the meaning of 28 U.S.C. 1332(a).

C. Defendant Wilkes is a citizen of and domiciled in the State of Florida. Wilkes primarily worked and lived in the greater Tampa area including Hillsborough and Pinellas County at all times relevant herein. He remains a Florida resident and citizen.

2. Venue is proper in the United States District Court for the Middle District of Florida (Tampa division) pursuant to 28 U.S. Code § 1391(b)(1) and 28 U.S. Code § 1391(d) as it is the judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

3. All claims here are pleaded in the alternative and regardless of consistency in accordance with Federal Rule of Civil Procedure §8(d).

## PARTIES

4. Plaintiffs Psaila and Morante are the founding partners, sole owners, and only members of Plaintiff Marcosquared, LLC, a California limited liability company and successor-in-interest to Marco Marco LLC (which was also a California limited liability company solely owned and

2

managed by Psaila and Morante).

5. Likewise, Plaintiffs Psaila and Morante are citizens and residents of the State of California and were citizens and residents at all times pertinent to this complaint.

6. Defendant James L. Wilkes II ("Wilkes") is a high-profile torts attorney with a nationwide practice. While Wilkes primarily practices out of his offices in Tampa, Florida, Wilkes is also admitted in at least ten (10) state bar associations including California, Texas, and Florida. Wilkes is a citizen of the State of Florida.

**Facts Common to All Claims**

7. It is well known to even the most casual observers, that Erika Girardi's husband Tom Girardi, aka TG is the most famous American lawyer who ran his law firm as a Ponzi scheme and got caught. He was eventually tried, convicted and imprisoned. Prior to TG's downfall, Girardi's long-time friend, Defendant Jim Wilkes advised Erika that she "would have to get as far away from Tom as you can." On November 3, 2020, just weeks before TG creditors filed the bankruptcy cases, Erika filed for a dissolution of her marriage to TG. By this time, Wilkes suspected the extent of TG's criminality, and that Erika could easily be seen as complicit in TG's acts of fraud, deceit, embezzlement, and theft. To defend Erika from the consequences of conspiring with her husband, Wilkes decided

3

that a defense strategy based on denial and misinformation would to be employed in the nation's media as well as in the many state and federal courtrooms.

8. Upon information and belief, Wilkes knew Erika would need money, so Wilkes, opportunistically, saw that he could tap into the PPP program to fund his involvement with Erika. (Interestingly Tom Girardi got a PPP loan within eight days of the first PPP loan to Jim Wilkes) To obtain the PPP loans, Wilkes filed applications containing false representations for two loans in the amounts of $2,393,079 (approved 04/07/2020 for payroll expenses) and $2,000,000 (approved 01/25/2021 for payroll expenses) to The Wilkes Firm, P.A. Tampa 33609-2755 & 2700. The U.S. Small Business Administration forgave both of these loans based on Wilkes' representation that the proceeds of the loans had been paid to Wilkes' law firm employees who would have otherwise gone without compensation for the 2020-2021 time period.

9. Wilkes perpetrated his fraud on the PPP program by materially overstating the number of Wilkes Firm, PA employees and by falsely claiming that his employees lost salaries during the pandemic. In fact, the Wilkes law firm continued to operate, continued to settle and even try cases, and while the pandemic caused a lag in cash flows, the pandemic did not substantially affect the firm's tort business to the point of operating

at a loss.

10. In actuality, Wilkes wrongfully used over $2 million of his firm's PPP loan proceeds to pay for Erika's expenses, including attorneys' fees for the many attorneys Wilkes hired to defend Erika criminally and civilly. On information and belief, Wilkes continues to direct Erika's many attorneys and to direct these attorneys in their work as if Wilkes was the client.

11. The PPP funds that Wilkes used to benefit Erika represents an amount stolen from the United States treasury. In Wilkes' first application, he represented to the PPP that his firm had 40 full-time positions more than it actually had. In his second application, Wilkes represented that his firm had 41 full-time positions more than it actually had.

12. With stolen cash in hand Wilkes devised an aggressive public relations strategy to assuage the millions of Erika's fans who watched her on the pseudo-reality TV show entitled The Real Housewives of Beverly Hills ("RHOBH"). In 2007, after being encouraged by TG and other close friends, like Wilkes, Erika revived her entertainment career. TG backed her financially, spending millions of embezzled dollars to pay Erika's expenses as she attempted to parlay her modest singing and dancing talents into a performance persona that was particularly popular with LGBT/LGBTQ audiences.

13. In particular, Wilkes used the litigation process to intimidate,

5

threaten, coerce, and extort Chris Psaila and Marco Morante from suing Erika for making the false accusations that they and Marco Marco committed credit card fraud. Wilkes knew that Erika had to maintain her falsehoods or otherwise admit that she knew of and was involved in Tom Girardi's Ponzi schemes. Thus, Wilkes knowingly perverted the processes of litigation by directing Erika to continue to deny her lies and by fabricating frivolous motions unrelated to the matters being litigated and for the purpose to delay proceedings while attempting to bolster Erika's reputation in the media and social media reporting on the TG/Erika "saga."

14. Further, Wilkes conspired with Erika, Ribatallada and Minden by agreeing use the stolen PPP funds to abuse the litigation processes in Federal Court in California and in Miami Dade county.

15. As an experienced attorney, Wilkes knew that if the federal government dismissed the Psaila indictment, Plaintiffs would seek to hold Erika accountable civilly and, possibly, criminally. Likewise, Wilkes understood that Erika's accusations that Marco Marco, Psaila, and Morante committed credit card fraud constituted the sole series of events where Erika directly participated in criminal activity at TG's request. That is, while Erika does not dispute that Girardi Keese spent over $25 million on her from 2007 – 2019, there is no evidence that she had any

6

involvement in TG's and Girardi Keese's law practice or any involvement in the accounting practices or procedures that supported her.

16. Because TG conspired with Erika to make the credit card fraud complaints against Marco Marco et al. as "cover" for Amex to refund nearly $800,000 refund to Girardi Keese, Wilkes correctly believed that he would have to devise a defense strategy specifically focused on diverting and intimidating Marco Marco, Psaila, and/or Morante from successfully taking Erika to a civil trial because those processes of law would inexorably link Erika's tortious conduct to criminal prosecution.

17. So, by late 2019, Wilkes expected the Psaila indictment would be dismissed (as it was on September 28, 2021) just as he expected the California Supreme Court to disbar TG (June 1, 2022); and just as he expected the federal criminal-trial jury to convict TG of fraud (August 27, 2024). TG, at age 86, is now prisoner number 43156-510 at the Terminal Island Federal Correctional Institution in San Pedro, CA.

18. Prior to the federal government dismissing Psaila's indictment, the belated California Bar action and TG's conviction, Wilkes, with TG's aid and support, hired counsel for Erika to file for the dissolution of marriage. Since then, Wilkes has had Erika falsely represent herself as an unmarried person. In fact, Erika remains married to the incarcerated Wilkes so that she can retain her ability to bar TG from testifying against

her. Cal. Evid. Code § 971 (West).

19. On August 29, 2023, Christopher Psaila sued Erika and others alleging a conspiracy to maliciously prosecute Psaila as a subterfuge to justify American Express's refund of almost $800,000 to Girardi Keese.

20. Psaila's lawsuit finally forced Wilkes to contrive a storyline for Erika that would plausibly explain how she could not have known that she was part of TG's criminal conspiracy to use Plaintiffs as a means to defraud Amex out of almost $800,000.

21. In support of Erika's motion to strike Psaila's complaint in Case No. 23-cv-07120 in the District Court for the Central District of California, Wilkes crafted a Declaration (affidavit) for Erika to sign which Wilkes knew to be perjurious. In that Declaration, Wilkes had Erika swear that she believed that Marco Marco and Psaila had defrauded her and that she made the criminal accusations on her own. Since filing that perjurious document, Wilkes has successfully shielded Erika from giving depositions or responding to discovery by ignoring the rules of discovery.

22. At the same time that Wilkes was supervising Erika's defense in Psaila's case by hiring an attorney named Evan Borges, Wilkes was also directing Attorney Evan Borges to make outrageous and unsupported claims in several of the Bankruptcy cases, all with the intent to use the Bankruptcy cases to promote his false narrative of Erika and the

8

Housewife victim of the Hustler attorney.

23. Besides paying for Erika's defense lawyers for the Psaila lawsuit, Wilkes also selected and supervised her defense lawyers in the Girardi and Keene bankruptcy. Wilkes handpicked choice, Evan Borges dutifully implemented Wilkes' orders that Erika not cooperate with the Trustee's efforts to recover funds, but would, instead, obfuscate the proceedings as much as possible.

24. After years of filings that abused the legal processes, the Trustee confronted the Wilkes/Borges obstructionism in her reply filed on August 8, 2023:

> Erika's relentless and baseless opposition continues to require the Trustee to devote significant resources to defending the Estate. With each opposition, the Estate's administrative expenses needlessly climb. And when administrative expenses grow, the Debtor's victims needlessly pay the price. For decades, Erika funded her extravagant lifestyle off money stolen from the Debtor's clients. By continuing to interfere with the Trustee's administration of the Debtor's case, Erika is re-victimizing the same people she claims to be helping. Simply put, Erika's self-appointed role as caretaker of the victims—the same victims she has publicly and repeatedly questioned—is nothing more than a farce.

Page 5 of Doc. 1869 in Case No. 20-bk-21022 in the U.S. Bankruptcy Court for the Central District of California and refiled as an exhibit as part of Document 124 cited in Paragraph 16 of this Complaint in August 2024.

25. Likewise, Wilkes directed Borges to file bogus motions, perjurious affidavits and declarations, and to advance ridiculous, time-

9

consuming oppositions in Plaintiffs' lawsuits, including, but not limited to:

   a. *Psaila v. Erika Girardi,* et al., Case No. 23-cv-07120, in the United States District Court for the Central District of California.

   b. *Marco Morante v. Erika Girardi, et al.,* Case No. 2024-CA-015118, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

26.   In a telling interview in December 2023, Wilkes and Borges attempted to assuage Erika's negative ratings after the airing of the ABC News documentary, *The Housewife and the Hustler*, which aired in 2021. In that interview/conversation, Wilkes admits to being at least one of "other sources of unknown origin." The December 2023 conversation aired as part of *The Housewife and the Hustler 2: the Reckoning* in February 2024 included the following:

> **Evan Borges:** In summer 2021 you and Erica were referred to our firm.
>
> **Jim Wilkes:** So far, we've had to play defense.
>
> **Evan Borges speaking to Wilkes:** I had some very basic questions for her, why did you file for divorce just a month or so before the bankruptcy cases? And what did you know? And her answer to me is privilege, but I would describe it as escalating pressure, lawsuits. My strong suspicion – I wasn't there – is that Tom Girardi consistently lied to this poor woman, and she had no idea. She had no visibility into finances. I heard from you, he forbade her from wearing blue jeans. That's called either a control freak or an asshole; however you want to put it. She left that marriage. The only reason Erica was really able to do that was because of help

10

from a longtime friend she had - meaning you, I think you gave her $150,000 to pay for a lawyer and to move out.

**Evan Borges [Speaking to the camera]:** Jim opened up a bank account with her and provided her with, over time, a significant amount of money to pay for lawyers to make a down payment on a rental. I mean, if she didn't have the help of a friend who had a lot of money, she was lost. I mean, it was, it was bad.

**Female voice questioning Wilkes:** How much have you spent on this?

**Jim Wilkes speaking to camera while video shows photos of Erika on yacht and Arnold Schwarzenegger/Charles Barkley with Tom Girardi:** I have no idea. Over a couple million. What It's cost me in my practice, I can't conceive. I knew Tom since about 2000. Erica and Tom and I would get to spend time together hanging out. We probably did four or five or six trips with them. Tom knew a lot of fun people. I was in boxing, and I got a picture somewhere of Schwarzenegger sitting on the right, Charles Barkley on the left. He loved that kind of stuff. But around 2009 or 10, Tom changed. Tom became very angry. You could tell there was a little hustle in him, but he was always cordial, and he stopped being cordial, and it scared me. Erica has been the victim of a great injustice. Her crime was having a husband who wasn't trustworthy, that she stayed with for 20 years.

27. Thus, Wilkes readily confirmed that he is financially supporting Erika, that he selected Attorney Borges to be a co-counsel to help Wilkes lead Erika through her troubles, and that he had millions – likely from the PPP moneys obtained from the federal government for his law firm employees – invested in Erika.

28. By providing financial aid to Erika, Wilkes is in *de facto* and *de jure* violation of Florida Bar Rule 4–1.8(e) prohibiting a lawyer from providing financial assistance to a client in connection with pending or

11

contemplated litigation. Furthermore, because Borges and Wilkes admit that Wilkes came to EJ's rescue as a friend, no attorney-client relationship arose between Wilkes and EJ [*People v. Gionis, supra,* 9 Cal.4th at p. 1212, 40 Cal.Rptr.2d 456, 892 P.2d 1199].

29. However, neither Wilkes nor Borges were concerned with the attorney-client relationship because they knew that Erika's only hope was to keep her from testifying under oath as Wilkes ran out the litigation clock and sapped the resources of trustees, plaintiffs and trial courts.

30. Wilkes plan was taken from the playbook of the "scorched earth" litigator:

A. Wilkes would hire and supervise attorneys in the civil lawsuits against Erika.

B. Wilkes, then, would direct the attorneys to keep Erika from being cross-examined, in deposition or hearing, by any means whatsoever and in violation of Attorney Rules of Conduct and the California, Florida, and Federal Rules of Civil Procedure. That is, Wilkes intentionally violated his attorney's oath to abide by applicable codes of conduct and rules of civil procedure to ensure that Erika, and her associates, would not be put into positions of being cross-examined under oath in deposition and trial.

C. Moreover, a primary purpose of the conspiracy to wrongfully

frustrate the civil proceedings was to intimidate and coerce Psaila, Morante, and their companies from pursuing their claims against Erika, Ribatallada, Minden, and now, Wilkes.

D. Another primary purpose of Wilkes's coopting the administration of justice was to discourage TG's defrauded, former clients from suing Erika as a co-conspirator in perpetuating TG's fraud and embezzlement scheme.

31. Wilkes, to date, has successfully frustrated the legal processes in cases wherein Plaintiffs (and others) are attempting to clear their names and/or gain redress for the civil wrongs perpetrated against them. His acts stonewalled and obfuscated the civil discovery processes set out in codes of conduct, rules of civil procedure, and common law. In short, Wilkes crossed the line from vigorous advocacy into abuse of process.

32. Wilkes' abuse and misuse of the legal processes include, but are not limited to the following acts:

A. **Psaila v. Erika Girardi et al, Case No. 2:23-cv-07120, in the United States District Court for the Central District of California:** Wilkes paid for and supervised Erika's defense attorneys and drafted the perjurious affidavits given by Erika Jayne, Minden, and Ribatallada in support of their efforts to dismiss/strike the Psaila complaint. In abusing the legal processes of litigation, Wilkes attempted to pressure

13

Plaintiffs to abandon their causes of action by running up legal fees and costs. By spreading the untruth that "Psaila got off on a technicality," Wilkes aided and abetted Defendants Erika, Amex, Minden, and Ribatallada et al. in their tortious conduct as well as abusing the litigation processes by threatening and intimidating Psaila and Morante.

B. **Sheldon Law Offices v. Girardi, EJ Global et al., Case No. 20STCV47160, in the Superior Court of the State of California for the County of Los Angeles, Central District:** in this case, Wilkes paid for and supervised Erika's defense attorneys and advised Erika prior to her deposition on August 4, 2022, that she would have to confirm that: a) she still believed she was telling the truth when she made criminal accusations against Marco Squared, LLC, Psaila, and Morante; b) the Wilkes law firm was billing her for legal services (even as Erika Jayne was forced to admit in that deposition that "Yes. Jim Wilkes, my attorney, my personal attorney, has loaned me the money to pay my legal fees."); and c) she was ignorant of Tom Girardi's malfeasance.

C. **Morante v. Girardi, et al., Case No. 2024-CA-0151118, in the Circuit Court for Miami-Dade County, Florida:** in this case, Wilkes, as co-counsel, pays, directs, and supervises his co-defense attorneys to ignore Plaintiff's allegation that Erika's conspiracy to defame Morante

14

began in 2016. By doing so, Wilkes failed to respond to discovery requests designed simply to verify that which is undeniable, i.e., that Erika was entertaining and doing business in Florida in 2016.

33. In weighing the many acts of obstruction in the many cases affecting Plaintiffs, Wilkes acted outside the scope of his representation because a Florida attorney: a) does not provide a professional service when the attorney is participating in a conspiracy to aid or abet a client's fraudulent scheme; and b) engaging in fraudulent conduct is outside the scope of legitimate professional representation.

34. Further, as cited, Florida Bar Rule 4–1.8(e) prohibits a lawyer from providing financial assistance to a client in connection with pending or contemplated litigation. That is, Wilkes is legally representing Erika, whom he is currently supporting, or has financially supported.

35. In directing and planning Erika's cover-up from at least 2020 to the present, Wilkes chose to abuse legal process in the several matters of litigation listed herein in order to convince the trial courts, the RHOBH production team, other entertainment employers and venues, and Erika's fanbase that Erika told the truth to the Secret Service about the alleged fraud perpetrated upon her by Plaintiffs.

36. Wilkes, as the mastermind of the scheme to promote Erika's career at the expense of Plaintiffs' lives and careers, proximately caused

the damages suffered by Plaintiffs from the loss of their business and livelihoods in the years 2020 to the present.

37. Likewise, Wilkes advised Erika, Minden, and Ribatallada what they should and could say to the media, never inquired as to, or ignored the truth about, the false claims made against Plaintiffs.

38. For example, in addition to the inadequate claims made in the bankruptcy and state cases, on February 9, 2023, Erika Jayne, at Wilkes direction, told the *Los Angeles Times*: "In no way did I pull a scam to get $760,000 to help anybody get this money [referring to the money Erika accused Psaila and Morante of feloniously charging to Erika's Amex credit card]."

39. Wilkes ulterior motives and purposes in exercising his illegal, improper, and perverted use of process were, in essence, similar to TG's in that Wilkes moved himself into the same societal standings as TG and became a central part of Erika's nationwide narrative.

### Count I: ABUSE OF PROCESS

40. Plaintiffs incorporate paragraphs 1- 39 herein as if fully pled.

41. Wilkes has knowingly violated Florida's Rules Regulating the Bar by financially supporting Erika to the tune of several millions of dollars with PPP funds that were unlawfully obtained by fraudulent means.

42. Wilkes representation of Erika Jayne, Minden, and Ribatallada

16

in multiple lawsuits (both on the record and off) and his directions to counsel retained by Wilkes, in the bankruptcy and state cases, to stonewall, obfuscate, delay, and obscure the truth that the U.S. Attorney dismissed the criminal complaint against Psaila on the merits and that Plaintiffs did not commit credit card fraud, constitutes an illegal, improper, and/or perverted use of the legal process.

43. By declining to answer discovery ordered by the trial judge in Case No. 2024-CA-015118, *Marco Morante v. Erika Girardi, et al.* in the Circuit Court in and for Miami-Dade County, Florida, by taking the ridiculous position that Defendants do have to answer any interrogatories or requests for admission or produce documents that involve events prior to 2022, Wilkes has abused the discovery and adjudication processes of the circuit court.

44. By intentionally making baseless claims meant to impede the litigation processes and aggrandize Erika in the nation's media, Wilkes is abusing the administration of justice in a way that injures more than Plaintiffs and the hundreds (or thousands) of former TG clients.

45. Because of Wilkes actions and inactions in manipulating the legal processes and causing others to manipulate the legal processes of the several federal and state courts, as set out above, Plaintiffs have suffered and continue to suffer economic damages in the form of lost

17

business, lost profits, and, of course, legal and other fees in connection with Erika Jayne's, Minden's, and Ribatallada's continued attacks on Plaintiffs' business practices, veracity, and characters.

### Count II: CONSPIRACY TO ABUSE PROCESS

46.  Plaintiffs incorporate paragraphs 1-39 and 41-45 herein as if fully pled.

47.  In working with Erika Jayne, Minden, Ribatallada, Evan Borges and others, Wilkes formed a conspiracy with these persons, and with others not named herein, to abuse the legal processes of the several lawsuits cited and others and did so by using stolen US Treasury moneys including but not limited to, the bankruptcy cases that ensued from the collapse of Girardi's corrupt legal empire and Plaintiffs' civil cases against Erika and her co-conspirators.

48.  Defendant Wilkes conspired to abuse of the legal processes on behalf of Erika Jayne and others and sought to harm and did harm Plaintiffs.

**WHEREFORE**, for each count pled herein, Plaintiff respectfully requests that this Honorable Court:

(a)  Award damages in the amount of or being greater than $300,000.00 for each Count set out herein;

(b)  Award exemplary and punitive damages;

(c) Order Defendants to pay Plaintiff's reasonable attorney's fees and costs incurred in connection with this action;

(d) Award prejudgment interest;

(e) Sanction Wilkes by ordering him to end his professional and financial relationships with Erika; and

(f) Enter any other orders or further relief as the Court may deem proper.

DONE on 19 December 2025.

Respectfully submitted,

*/s/ Bruce B. Bealke*
_____

BRUCE BERNARD BEALKE
Illinois SBN 6200543
Admitted via pro hac vice
77 West Wacker Drive, St. 45001
Chicago, IL, 60601
(310) 562 6856
Bealkelaw@protonmail.com
Lead Counsel for Plaintiffs

WILLIAMS & SYFRETT, PLLC.
/s/ *Stephen Syfrett*
STEPHEN SYFRETT, ESQ.
FL BAR NO.: 124536
502 Harmon Avenue (32401)
Panama City, Florida
(850) 763-5368 (telephone)
Stephen@wsgfirm.com
*Counsel for Plaintiffs*